UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TACHIANA PRUITT**,<br>Plaintiff,<br>v.<br>**DISTRICT OF COLUMBIA**,<br>Defendant. | Case No. 24-cv-541 (CRC) |

**MEMORANDUM OPINION**

Plaintiff Tachiana Pruitt worked for the District of Columbia Office of Lottery and Gaming ("D.C. Lottery" or "the District") until she was fired in 2023. She alleges that in the year preceding her termination, the D.C. Lottery failed to pay her overtime she was due, asked her to complete work assignments while she was on medical leave, wrongly denied her request to extend her leave, and ultimately fired her for exercising her employee rights. She filed this lawsuit in February 2024, bringing claims under the D.C. Human Rights Act ("DCHRA"), the federal Family and Medical Leave Act ("FMLA"), the D.C. Family and Medical Leave Act ("DCFMLA"), and the Fair Labor Standards Act ("FLSA"). The District now moves for summary judgment, asserting that there are no genuine disputes of material fact and that Pruitt's claims fail as a matter of law. Concurring, the Court will grant the District's motion and dismiss the case.

## I. Background

### A. Job Duties and Initial Leave Requests

The D.C. Lottery hired Pruitt as a web communications specialist in November 2017. Def.'s Mot. for Summ. J., Statement of Material Facts ("SOMF") ¶ 4. She was responsible for developing the lottery's social media strategy and virtual presence. See id. ¶¶ 9, 10, 14. Among

other tasks, she updated the lottery's social media and responded to customer questions online. Def's Mot. for Summ. J. ("MSJ"), Ex. 3 at 4 (describing Pruitt's job functions as "social media expert and resource for open access [communications]"); MSJ, Ex. 4 at 1 (listing one of her "work outcomes" as developing "meaningful content for use on web and social platforms"); MSJ, Ex. 5 (providing an e-mail chain with Pruitt discussing the D.C. Lottery's social media strategy). Pruitt described her role as "very forward-facing," because "[i]f you screw up, everyone knows because they can see it." MSJ, Ex. 2 at 84:5–8.

The job description for the web communications specialist position noted that "[a]ctivities can occur on nights and weekends." MSJ, Ex. 1 at 8. Pruitt testified in her deposition that she worked "overtime, above and beyond" forty hours per week. MSJ, Ex. 2 at 177:3–6. For example, there was "a time" when someone won a $1 million lottery prize on New Year's Eve, and Pruitt "stayed up all night doing the social media for that." Id. at 180:17–22. She also recalled working overtime when the Mega Millions or Powerball jackpot exceeded $300 million, which would happen "all the time." Id. at 181:9–16; see also id. at 182:11–15 (noting that the jackpot would sometimes increase "over the weekend" or "over the holidays"). However, Pruitt could not recall which days she worked overtime, how often she worked overtime, or how many hours she worked. See, e.g., id. at 181:1–8, 181:17–182:2, 183:5–7.

In November 2021, Pruitt asked to take leave from work for the birth of her child. She requested 695 hours of leave under the DCFMLA, MSJ, Ex. 25 at 1–3, and the District granted her 640 hours of leave—including 320 hours of paid family leave—from October 2021 through October 2022, MSJ, Ex. 26 at 3–5. The first three months of leave were taken continuously; the latter nine months were intermittent. MSJ, Ex. 26 at 4. In March 2022, Pruitt filed a second request for leave from work, this time to care for her husband. See MSJ, Ex. 27 at 1–4. She

requested 640 hours of intermittent leave under the FMLA, id. at 1–2, and the District approved 390 hours of leave between March 2022 and March 2023, MSJ, Ex. 28 at 1–2.

B. December 2022 Letter of Admonishment

In November 2022, Pruitt participated in an e-mail chain discussing the management of the agency's e-mail inbox for "customer service complaints and issues." MSJ, Ex. 9 at 2. Melissa Davis, the D.C. Lottery's chief of communications, asked Pruitt to "manag[e] communications" for the inbox. Id. at 3–4. In response, Pruitt asked Jayre Reaves, the D.C. Lottery's marketing director, whether he agreed with this assignment. Id. at 3. When Reaves replied that he did, Pruitt brought the question to the D.C. Lottery's executive director. Id. at 2–3. Eventually, all three supervisors agreed that Pruitt should monitor the e-mail inbox and reply to customers. Id. at 1. In a follow-up e-mail, Pruitt briefly mentioned that she had worked unpaid overtime "in the recent past," so she wanted to know when she could "expect an increase in [her] pay." Id. at 1–2.

Around the same time, Pruitt accrued two unscheduled absences. MSJ, Ex. 7 at 1. According to the policies and procedures manual governing D.C. Lottery employees, "[a]n absence from duty without official approval or for which a leave request has been denied shall be recorded as 'absence without leave' (AWOL)." MSJ, Ex. 8 at 35. The office would "take appropriate disciplinary action against employees determined to be AWOL up to and including termination." Id.

In December 2022, Davis and Reaves issued a letter of admonishment to Pruitt regarding her "performance deficiencies and attendance." MSJ, Ex. 7 at 1. The letter first addressed her "insubordinate behavior" during their exchange about the customer-service e-mail inbox. Id. In the supervisors' view, escalating the issue to the executive director was "unprofessional." Id.

Regarding her unscheduled absences, the letter noted that "[s]atisfactory attendance is a requirement of [her] role and is essential to the department's operation." Id. at 2. Pruitt was advised that if she did not make improvements, she could face disciplinary action. See id.

C. December 2022 DCFMLA Leave Request

Two days after receiving the letter of admonishment, Pruitt stopped working. MSJ, Ex. 2 at 171:22–172:6. She instead submitted a third leave request under both the FMLA and DCFMLA, citing "severe anxiety and depression." MSJ, Ex. 3 at 2, 5. She requested 960 hours of continuous leave from December 12, 2022 (the following Monday) to May 1, 2023. Id. at 2. Pruitt's healthcare provider certified that she would be incapacitated and unable to perform "all applicable job functions" during her leave. Id. at 5. (Pruitt provided further detail during her deposition, explaining that her anxiety was "stress related from the work and everything that had been going on." MSJ, Ex. 2 at 107:15–21; see id. at 147:9–11.) Davis signed the leave request on December 12, 2022, signifying only "the need for the leave," not "approval of the request." MSJ, Ex. 3 at 3. Pruitt submitted the request to the D.C. Lottery's human resources department ("HR") the next day. Id. at 1.

In January 2023—before HR had approved the leave request—Davis e-mailed a work task to Pruitt and invited her to a meeting. MSJ, Ex. 11 at 1; MSJ, Ex. 12 at 2. Pruitt did not respond to the e-mail, complete the work request, or participate in the meeting. See MSJ, Ex. 13 at 1. When Davis asked HR about Pruitt's work status, an HR program manager responded that her leave request was still being processed. Id. Pruitt was ultimately approved for 640 hours of continuous FMLA leave, effective December 12, 2022 through March 31, 2023, as she had requested. MSJ, Ex. 14 at 1; MSJ, Ex. 15 at 1–2. Pruitt concedes that while she was on leave, she was not threatened with discipline for failing to complete any work. MSJ, Ex. 2 at 165:6–22.

D. April 2023 ADA/FMLA Request

On April 3, 2023—a few days after her latest round of FMLA and DCFMLA leave expired—Pruitt requested "a reasonable accommodation under the Americans with Disabilities Act (ADA) to extend [her] Family and Medical Leave due to experiencing debilitating migraines several times per week." MSJ, Ex. 16 at 1. She attached two documents to her request. First, she included an FMLA leave request form with supporting documentation, as she had done for her previous leave requests. Id. at 2–8. The form requested 640 hours of leave "[i]n a continuous block of time from 3/31/2023 to 12/2023." Id. at 2. Pruitt's medical provider again affirmed that she would be unable to perform "all job functions – computer activity" during this period. Id. at 6; see also id. at 7 (acknowledging that Pruitt would be "incapacitated" due to her condition). Second, Pruitt submitted a "Reasonable Accommodation Request" with supporting documentation, which she had not done previously. Id. at 9–13. On this form, Pruitt wrote that she was "requesting to extend [her] FMLA leave" through December 2023 because she could not take medication for her migraines while she was pregnant. Id. at 10. Her medical provider reiterated that she was "unable to perform all job duties/functions" and "unable to work currently." Id. at 11–12. The provider certified that Pruitt could not perform any work even if she had an accommodation. Id. at 12.

Shortly after Pruitt submitted this request, an HR program manager informed her that she had exhausted her medical leave. MSJ, Ex. 17 at 2. The manager explained that eligible employees were entitled to twelve weeks (480 hours) of leave during a 12-month period under the FMLA, and sixteen weeks (640 hours) of concurrent leave during a 24-month period under the DCFMLA. Id. According to HR, Pruitt had used all of her available leave between

December 2022 and March 2023. Id. Thus, any leave taken after March 31, 2023 would not be covered by the FMLA or DCFMLA. Id.

On May 12, 2023, the HR program manager notified Pruitt that her request for a reasonable accommodation had been denied. MSJ, Ex. 18 at 2. The manager again explained that Pruitt had exhausted her DCFMLA leave in March 2023, and "an extended absence beyond the 16 weeks of DCFMLA leave . . . would adversely impact business operations." Id. The manager offered to "consider an alternative accommodation request" but reminded Pruitt that she was "no longer on approved leave." Id. at 3.

E. May 2023 Termination

After HR informed Pruitt that she was no longer on approved leave, she failed to return to work for more than two weeks. See MSJ, Ex. 21 at 1. The D.C. Lottery's policies and procedures manual provides that an employee abandons her position when she fails to report for duty as scheduled, is absent without authorization for ten consecutive days without communication, and fails to disclose information about when she intends to return to duty. MSJ, Ex. 8 at 66. On May 30, 2023, the D.C. Lottery terminated Pruitt's employment because she "failed to report to work and [was] unable to perform the essential functions of [her] position." MSJ, Ex. 21 at 1.

F. Procedural History

Pruitt filed this lawsuit in February 2024. She amended her complaint a few months later, bringing claims under the DCHRA, the ADA, the FMLA and DCFMLA, and the FLSA. See Am. Compl. ¶¶ 45–77. After the District moved to dismiss the amended complaint in part, see Def.'s Mot. to Dismiss the Am. Compl. at 1–2, Pruitt voluntarily dismissed her ADA claims and limited the temporal scope of her DCFMLA claim, see Pl.'s Voluntary Partial Dismissal at

1. Following discovery, the District moved for summary judgment on Pruitt's remaining claims. The motion is fully briefed.

## II. Legal Standards

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, the Court examines "all relevant evidence presented by the plaintiff and defendant." Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008). While the Court resolves all factual disputes and draws "all justifiable inferences" in favor of the nonmoving party, Anderson, 477 U.S. at 255, the nonmoving party must also offer more than mere allegations or denials, see Fed. R. Civ. P. 56(c). It must instead support its opposition with affidavits, declarations, or other evidence providing specific facts that establish a genuine issue for trial. See Stein v. CIA, 454 F. Supp. 3d 1, 14 (D.D.C. 2020). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," then the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

## III. Analysis

Pruitt's amended complaint raises claims under the DCHRA, the FMLA and DCFMLA, and the FLSA. Specifically, she alleges that the District (1) discriminated and retaliated against her by denying her accommodation requests and ultimately terminating her employment, see Am. Compl. ¶¶ 47–49, 63; (2) interfered with her approved FMLA leave, see id. ¶ 66; and

(3) failed to pay her overtime, see id. ¶¶ 69–70. The District maintains that Pruitt was properly compensated during her employment, and she was terminated because she failed to return to work after exhausting her leave. See Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("MSJ P. & A.") at 2–3. Because Pruitt has conceded some claims and failed to establish a genuine dispute for the others, the District is entitled to summary judgment.

A. Preliminary Issues

Before turning to the merits of Pruitt's claims, the Court must address two threshold issues, both of which arise from her opposition to the District's motion.

*1. The District's Statement of Material Facts*

As this Court recently explained, "[t]he Federal Rules of Civil Procedure and the Local Rules of this Court describe the means by which a party may identify genuine issues of material fact at summary judgment." Joseph v. Kaplan, No. 22-cv-2881 (CRC), 2026 WL 673182, at *4 (D.D.C. Mar. 10, 2026). The Federal Rules of Civil Procedure "explicitly require a party opposing summary judgment to support an assertion that a fact is genuinely disputed with materials in the record." Oviedo v. Wash. Metro. Area Transit Auth., 948 F.3d 386, 396 (D.C. Cir. 2020). The Court's Local Rules further specify that an opposition brief "shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." Local Civ. R. 7(h)(1). If the opposing party fails to dispute a fact identified by the moving party, then the Court may assume the fact is admitted. See id.

Early in this litigation, the Court "directed" the parties to Local Civil Rule 7(h) "regarding the requirements for motions for summary judgment and oppositions." Scheduling

Order (ECF No. 19) ¶ 7. Complying with this directive, the District provided a "statement of material facts for which there is no genuine dispute." SOMF at 1. But Pruitt neither responded to the District's statement nor provided her own statement of material facts for which there is a genuine dispute. Instead, she attached a handful of miscellaneous and unlabeled documents to her opposition brief. See Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n"), Exs. 1–5. The District contends that in light of Pruitt's failure to address its statement of material facts, the Court should treat those facts as undisputed. See Def.'s Reply in Supp. of Mot. for Summ. J. at 2–3.

"Requiring strict compliance with [Local Rule 7(h)] is justified both by the nature of summary judgment and by the rule's purposes." Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 150 (D.C. Cir. 1996) (quoting Gardels v. CIA, 637 F.2d 770, 773 (D.C. Cir. 1980)) (referring to Rule 7(h)'s predecessor). Because the parties are "most familiar with the litigation and the record," they can "crystallize for the district court the material facts and relevant portions of the record." Id. at 151. But when a party fails to comply with Local Rule 7(h), the Court "is under no obligation to sift through the record." SEC v. Banner Fund Int'l, 211 F.3d 602, 616 (D.C. Cir. 2000) (quoting Jackson, 101 F.3d at 154); see also Twist v. Meese, 854 F.2d 1421, 1425 (D.C. Cir. 1988) ("[A] district court judge should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact."). Accordingly, when the party opposing a summary judgment motion violates Local Rule 7(h), the Court is "perfectly within its authority" to consider the moving party's asserted facts as "undisputed for purposes of the motion." Oviedo, 948 F.3d at 397–98 (quoting Fed. R. Civ. P. 56(e)(2)).

By not responding to the District's statement of material facts, Pruitt failed to comply with both the Local Rules and the Court's scheduling order. Accordingly, the Court may treat the District's statement of material facts as undisputed.

*2. The Substance of Pruitt's Brief*

Pruitt's opposition brief is plagued by a more fundamental problem. Each section of the brief begins with long paragraphs describing the legal rules that apply to her claims, see, e.g., Pl.'s Opp'n at 4–6, followed by only a few sentences applying those rules to the facts of her case, see, e.g., id. at 7–10 (providing six paragraphs describing the legal standard followed by three sentences of analysis). And instead of responding to the District's arguments or explaining *why* summary judgment is unwarranted, the analysis primarily consists of conclusory statements. See, e.g., id. at 7 ("Plaintiff engaged in protected FMLA activity by requesting and taking protected leave. Plaintiff suffered an adverse employment action by being terminated at the conclusion of her leave.").

The odd structure of the brief appears to be the result of substantial, verbatim plagiarism of opinions from this circuit without attribution. For example, the first two paragraphs of the "argument" section appear to have been copied from Flores v. Crown Building Maintenance, Co., No. 23-cv-275 (JEB), 2024 WL 1795974, at *4 (D.D.C. Apr. 25, 2024), and Hamilton v. Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012), with no citations to those cases. The entire fifth page of the brief appears to be copied verbatim from Elzeneiny v. District of Columbia, 195 F. Supp. 3d 207, 217 (D.D.C. 2016), and Jiggetts v. Cipullo, 774 F. Supp. 3d 168, 210 (D.D.C. 2025), again without citations. Worse, there are at least two instances in which counsel's "analysis" references particular *facts* from other cases. See Pl.'s Opp'n at 5 (citing to "Jiggetts' testimony" and asserting that "Cipullo willfully interfered with Jiggetts' FMLA leave," even

though no one with those names is involved in this case), 8 (contending that "GEICO bears the burden of establishing that its auto damage adjusters fall within the exemption," but this case has nothing to do with GEICO or auto adjusters).

From the title to the signature line, Pruitt's opposition brief is about 3,230 words. Approximately 2,420 of those words—or 75% of the brief—appear plagiarized. Nine of the eleven pages seem to contain plagiarized passages, lifted from ten different cases, without attribution.

"It is professional misconduct for a lawyer to . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." D.C. Rules of Pro. Conduct r. 8.4(c). "[C]itation to authority is absolutely required when language is borrowed," United States v. Flynn, 411 F. Supp. 3d 15, 27 (D.D.C. 2006) (alteration in original) (quoting United States v. Bowen, 194 F. App'x 393, 402 n.3 (6th Cir. 2006)), and "[e]xtended quotation without quotation marks or appropriate citation amounts to misrepresentation to the court," Prairie State Generating Co. v. Sec'y of Lab., 792 F.3d 82, 96 n.10 (D.C. Cir. 2015). Courts in this circuit have an "intolerance for plagiarism," and they have directly admonished counsel for lifting quotations without context. Kilburn v. Republic of Iran, 441 F. Supp. 2d 74, 77 n.2 (D.D.C. 2006) (noting that counsel must "submit work product befitting of pleadings in a federal court"); see Cowtown Found., Inc. v. USDA, No. 22-cv-1258 (RC), 2023 WL 5507280, at *6 n.7 (D.D.C. Aug. 25, 2023) (noting that counsel "owes a duty of candor to the Court").

The sheer quantity and flagrancy of the apparent cribbing in this case suggests that it is not the result of mere "sloppy lawyering." Kilburn, 441 F. Supp. 2d at 77 n.2. It is instead a disservice to Ms. Pruitt, opposing counsel, and the Court. When counsel "make[s] no effort to tailor [the plagiarized case's] reasoning or language" to the present case, Ruhumuriza v. Higgins,

No. 25-cv-109 (SLS), 2026 WL 587636, at *8 (D.D.C. Mar. 3, 2026), the Court is under no obligation "to do counsel's work," id. at *11 (quoting Government of Manitoba v. Bernhardt, 923 F.3d 173, 179 (D.C. Cir. 2019)); see also id. at *8 (describing counsel's approach as "slapdash lawyering"). Nevertheless, in fairness to Ms. Pruitt and the adversarial process more generally, the Court has (where possible) looked past the unattributed passages and bare conclusory statements to discern the nature of Pruitt's arguments.

B. Merits of Pruitt's Remaining Claims

With those preliminary courses out of the way, the Court turns to the meat of the District's motion for summary judgment.

*1. Count I: Discrimination in Violation of the DCHRA*

Pruitt first contends that the District discriminated against her on the basis of her "disability/pregnancy" in violation of the DCHRA by (1) denying her December 2022 and April 2023 "accommodation requests," and (2) terminating her employment. Am. Compl. ¶¶ 47–49. Her opposition brief does not defend these claims or rebut the District's arguments in favor of summary judgment. See generally Pl.'s Opp'n (omitting any discussion of her claims under the DCHRA).

As a threshold matter, "[a] party opposing summary judgment who does not address an argument advanced in the motion is deemed to have conceded the argument." Banks v. Vilsack, 932 F. Supp. 2d 185, 193 (D.D.C. 2013) (quoting Hairston v. Boardman, 915 F. Supp. 2d 155, 160 (D.D.C. 2013)); see also Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (stating the same), aff'd, 98 F. App'x 8 (D.C. Cir. 2004). Because Pruitt did not respond to the District's arguments regarding her DCHRA discrimination claim, she has conceded the point. Accordingly, the District is entitled to summary judgment.

Even if this claim were not conceded, the Court would still arrive at the same result. Employment discrimination claims under the DCHRA "are analyzed using the same legal framework as federal employment discrimination and retaliation claims," with the relevant federal statute in this case being the ADA. DuBerry v. District of Columbia, 582 F. Supp. 2d 27, 40 (D.D.C. 2008); see Giles v. Transit Emps. Fed. Credit Union, 794 F.3d 1, 5 (D.C. Cir. 2015) (citing the same standard for discrimination under the ADA and the DCHRA); Hunt v. District of Columbia, 66 A.3d 987, 990 (D.C. 2013) ("Our decisions under the DCHRA regarding whether an employee was discriminated against because of a 'disability' effectively incorporate judicial construction of related anti-discrimination provisions of the [ADA]."). "When evaluating claims brought under the DCHRA, 'decisions construing the ADA [are considered] persuasive.'" Giles, 794 F.3d at 5 (alteration in original) (quoting Grant v. May Dep't Stores Co., 786 A.2d 580, 583–84 (D.C. 2001)).

a. Failure to Accommodate

Pruitt first alleges that the District discriminated against her by denying her December 2022 and April 2023 accommodation requests. Am. Compl. ¶ 47. The District construes this as a claim of discrimination based on a failure to accommodate. MSJ P. & A. at 13; see Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc) (providing a similar theory of discrimination based on a failure to accommodate). Because Pruitt does not argue otherwise, the Court will do the same.

To sustain a failure-to-accommodate claim under the DCHRA, the employee must establish that "(1) she was a qualified individual with a disability, (2) the [employer] had notice of her disability and (3) the [employer] denied her request for a reasonable accommodation." Waggel v. George Washington Univ., 957 F.3d 1364, 1371 (D.C. Cir. 2020) (alterations in

original) (quoting Ward v. McDonald, 762 F.3d 24, 31 (D.C. Cir. 2014)). The Court may analyze these prongs in any order, and failure to establish any one of the three elements proscribes the failure-to-accommodate claim. See, e.g., Ward, 762 F.3d at 31.

Under the first prong of this test, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The plaintiff must establish her ability to perform those functions (with or without reasonable accommodation) at the time the employer denied her request for accommodation." Minter v. District of Columbia, 809 F.3d 66, 70 (D.C. Cir. 2015); see also Flemmings v. Howard Univ., 198 F.3d 857, 862 (D.C. Cir. 1999) (noting that an employee "fell beyond the scope of the ADA's protection" when she was "wholly unable to work either with or without an accommodation"). If the plaintiff is unable to perform the essential functions of her job even with a reasonable accommodation, then her claim cannot survive summary judgment. See Doak v. Johnson, 798 F.3d 1096, 1106–07 (D.C. Cir. 2015).

Pruitt first claims that the District improperly denied her December 2022 request for FMLA leave based on her "severe anxiety and depression." Am. Compl. ¶ 47; MSJ, Ex. 3 at 5. Assuming *arguendo* that the District should have construed this as an accommodation request (rather than a leave request), Pruitt's claim falls short because she cannot demonstrate that she was a "qualified individual." See 42 U.S.C. § 12111(8). On the leave request form, Pruitt's medical provider indicated that she was unable to perform "all applicable job functions." MSJ, Ex. 3 at 5. The provider added that Pruitt would be entirely unable to work through the requested leave period. Id. at 5–6. Pruitt has failed to explain how, notwithstanding her medical

provider's comments, she could nevertheless complete the essential functions of her role with an accommodation. See Doak, 798 F.3d at 1107.[1]

Pruitt next claims that the District unlawfully denied her April 2023 request for an "accommodation" due to her severe migraines. Am. Compl. ¶ 47. Even if the Court construes Pruitt's request to extend her DCFMLA leave as a request for a reasonable accommodation, her claim fails for the same reason: She was not a "qualified individual." Pruitt's medical provider indicated on the accompanying FMLA certification that she was unable to perform "[a]ll job functions" between March 2023 and December 2023. MSJ, Ex. 16 at 6. The provider also affirmed that Pruitt was "unable to perform any of [her] job functions due to [her] condition." Id. On the "Reasonable Accommodation Request" form, the provider added that Pruitt was "currently unable to perform all job duties/functions" and required "extended time off as she is unable to work currently." Id. at 11–12; see also id. at 11 (noting that "mitigating measures [were] not working effectively"). Pruitt does not claim otherwise. Thus, she could not have been considered a "qualified individual," which precludes her DCHRA claim. See Minter, 809 F.3d at 69–70 (holding that an employee who had not worked in over three months and whose medical provider certified that she was "Totally Disabled" was not a qualified individual).

b. Intentional Discrimination

Pruitt next submits that the District discriminated against her on the basis of her "disability/pregnancy" in violation of the DCHRA by terminating her employment. Am. Compl.

---

[1] Even if Pruitt was a "qualified individual" when she filed her 2022 leave request, her claim fails because the District *granted* the request. See MSJ, Ex. 15 at 1–2. Recall that for a failure-to-accommodate claim, the employee must "demonstrate both that she requested a reasonable accommodation and that the request was denied" by her employer. Waggel, 957 F.3d at 1371. While it may have taken a few weeks to process, the District ultimately approved Pruitt's leave request, and she took all sixteen weeks of her DCFMLA leave. See MSJ, Ex. 2 at 152:3–11.

¶¶ 48–49. The District reasonably construes this as an intentional discrimination claim. See MSJ P. & A. at 13, 17–18. The Court will follow suit, as Pruitt has not addressed the claim at all.

Under the DCHRA, an employer may not terminate an employee based on their "actual or perceived . . . disability." D.C. Code § 2-1402.11(a) (2026). To state an intentional disability discrimination claim under the DCHRA, which is evaluated the same as an ADA claim, an employee "must prove that [she] had a disability within the meaning of the [DCHRA], that [she] was 'qualified' for the position with or without a reasonable accommodation, and that [she] suffered an adverse employment action because of [her] disability." Giles, 794 F.3d at 5 (quoting Duncan v. Wash. Metro. Area Transit Auth., 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc)). This standard applies the same definition of "qualified individual" described above. See Swanks v. Wash. Metro. Area Transit Auth., 179 F.3d 929, 934 (D.C. Cir. 1999). And because Pruitt was not a qualified individual at the time of her termination, she cannot sustain an intentional discrimination claim under the DCHRA. See McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 4 (D.C. Cir. 2010) ("[T]he ADA does not prohibit an employer from terminating an employee who cannot perform the essential functions of her position, albeit with a reasonable accommodation.").

Even if Pruitt was a "qualified individual," her intentional discrimination claim still falters. When a plaintiff "lacks direct evidence of discrimination," courts evaluate DCHRA claims under the "familiar burden-shifting framework" established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Giles, 794 F.3d at 5. After the employee establishes a *prima facie* case of discrimination, the burden shifts to the employer to assert a "legitimate, non-discriminatory reason" for the adverse action—which "an employer almost always will do by the

summary judgment stage of an employment discrimination suit." Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008). Once the employer offers a non-discriminatory explanation, the Court only evaluates the "central" issue at summary judgment: Whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." Id.; see also Brady, 520 F.3d at 493–94 (laying out and explaining this standard).

The District has provided a legitimate, non-discriminatory reason for terminating Pruitt's employment: After exhausting her medical leave, "she did not return to work and remained unable to perform the essential functions of her position." MSJ P. & A. at 19 (citing SOMF ¶ 83). As noted above, the DCFMLA allows any employee to take medical leave for "16 workweeks during any 24-month period." D.C. Code § 32-503(a) (2026).[2] The D.C. Lottery's internal policies provide that the two-year DCFMLA period "is computed on a rolling twenty-four (24) month period measured backward from the date leave commences." MSJ, Ex. 8 at 36. Pruitt does not dispute that she used sixteen weeks of DCFMLA leave between December 2022 and March 2023. See MSJ, Ex. 2 at 152:3–11; MSJ, Ex. 17 at 2. When the HR program manager informed Pruitt that she had exhausted her leave, she failed to return to work or explain her absence. See MSJ, Ex. 21 at 1. She also declined to take up the D.C. Lottery's offer to submit an alternative accommodation request. See MSJ, Ex. 18 at 3. After failing to report to work and indicating that she could not perform the essential functions of her position, her employment was terminated. MSJ, Ex. 21 at 1; see Gurara v. District of Columbia, 881 F. Supp.

[2] The FMLA provides for "12 workweeks of leave during any 12-month period," 29 U.S.C. § 2612(a)(1), which runs concurrently to DCFMLA leave, see Skrynnikov v. Fed. Nat'l Mortg. Ass'n, No. 21-7129, 2022 WL 2126399, at *1 (D.C. Cir. June 14, 2022) (per curiam).

2d 143, 148 (D.D.C. 2012) ("Absenteeism is, without doubt, a legitimate, non-retaliatory reason for taking action against an employee.").

The burden thus shifts to Pruitt to demonstrate that this reason was pretextual. A plaintiff may establish pretext by showing "*both* that the reason was false, *and* that discrimination . . . was the real reason." Akridge v. Gallaudet Univ., 729 F. Supp. 2d 172, 182 (D.D.C. 2010) (alteration in original) (quoting Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007)). An employee "cannot establish pretext simply based on her own subjective assessment of her own performance." Glass v. Lahood, 786 F. Supp. 2d 189, 217 (D.D.C. 2011) (quoting Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 7 (D.D.C. 2000)), aff'd, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011). Nor can a plaintiff rely on conclusory allegations of pretext. See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting such conclusory allegations as true . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.").

Pruitt has not presented sufficient evidence that the District's reason for her termination was pretextual. Indeed, her opposition brief does not address this claim *at all*. But even a cursory (and generous) review of the record reveals that Pruitt could not meet her burden. Her interrogatory responses state simply that she "was terminated for taking FMLA leave and seeking an accommodation," so "[a]ny explanation provided by Defendant that suggests any other reason for termination is pretextual." MSJ, Ex. 23 at 2. While she noted in her deposition that her supervisor once commented on how many leave requests she had submitted—a fact not mentioned in Pruitt's opposition brief—she was still granted the maximum amount of leave provided by statute. MSJ, Ex. 2 at 102:19–103:3; see MSJ, Ex. 15 at 1. Because there is no

genuine dispute about the non-discriminatory reason for Pruitt's employment, the District is entitled to summary judgment.[3]

*2. Count III: Violation of the DCFMLA*

Pruitt next raises claims of interference and retaliation under the FMLA and DCFMLA. Specifically, she contends that the District (1) interfered with her medical leave, and (2) retaliated against her for taking leave by firing her. Am. Compl. ¶¶ 65–66. "Courts interpret the FMLA and DCFMLA similarly," Murphy v. District of Columbia, 590 F. Supp. 3d 175, 185 (D.D.C. 2022) (quoting Cobbs v. Bluemercury, Inc., 746 F. Supp. 2d 137, 142 (D.D.C. 2010)), so the Court will "treat the analyses as identical," Waggel, 957 F.3d at 1371 n.1.

a. Interference

Pruitt alleges that the District interfered with her FMLA rights by giving her work assignments while she was on leave. Am. Compl. ¶¶ 26, 65–66. According to her amended complaint, her supervisors "pressured" her to take on additional assignments, id. ¶ 17, "[i]nsisting that [she] work while on approved leave and threatening her with discipline for not accepting assignments," id. ¶ 66.

To succeed on an FMLA interference claim, an employee must first show "that her employer 'interfered with, restrained, or denied the exercise of or the attempt to exercise, any right provided' by the FMLA." Williams v. Verizon Washington, D.C. Inc., 304 F. Supp. 3d

[3] During discovery, Pruitt identified Cariole Toliver as a potential comparator who was not written up for consistent unscheduled absences. MSJ, Ex. 32 at 12. To be sure, a plaintiff may point to an employer's differential treatment of a similarly situated comparator to establish pretext. See Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 301 (D.C. Cir. 2015). To permit this inference, however, the plaintiff must "establish that the comparator is nearly identical in all relevant respects." Geter v. U.S. Gov't Publ'g Off., 436 F. Supp. 3d 227, 239 (D.D.C. 2020). Pruitt has not made that showing. See MSJ, Ex. 2 at 53:3–54:10; MSJ, Ex. 32 at 12.

183, 189 (D.D.C. 2018) (quoting McFadden, 611 F.3d at 7); see 28 U.S.C. § 2615(a)(1). An employer may also interfere with an employee's FMLA leave by taking an action that has a "reasonable tendency to 'interfere with, restrain, or deny' the 'exercise of or attempt to exercise' an FMLA right." Gordon v. U.S. Capitol Police, 778 F.3d 158, 165 (D.C. Cir. 2015) (quoting 28 U.S.C. § 2515(a)); see also id. at 165–66 (concluding that an employer's general hostility toward FMLA requests and forcing an employee to take a fitness-for-duty exam before using her leave had a reasonable tendency to interfere with her FMLA rights). In other words, "discouraging an employee" from using FMLA leave can constitute interference. 29 C.F.R. § 825.220(b) (2025). Courts have further recognized that "work requests during FMLA leave can amount to interference." See Jiggetts, 774 F. Supp. 3d at 210 (quoting Mammen v. Thomas Jefferson Univ., 462 F. Supp. 3d 518, 525 (E.D. Pa. 2020)) (holding that "requiring [an employee] to work during her leave hours, assigning her more work than she could complete given her intermittent FMLA leave, and berating her when she could not complete that work" can constitute interference).

Once an employee has established interference, she must then show that she was "prejudiced" by the interference, restraint, or denial of her FMLA rights. Williams, 304 F. Supp. 3d at 189 (quoting McFadden, 611 F.3d at 7). The D.C. Circuit has recognized that "documented monetary losses and harm to future career prospects" are sufficient to establish prejudice. Waggel, 957 F.3d at 1377 (citing Gordon, 778 F.3d at 166). Courts in this district have since coalesced around this definition, defining prejudice in terms of monetary damages or loss of employment. See, e.g., Kelly v. Richard Wright Pub. Charter School, No. 16-cv-1853 (TJK), 2019 WL 451348, at *4 (D.D.C. Feb. 4, 2019) ("An FMLA violation prejudices an employee only when the 'employee loses compensation or benefits by reason of the violation,

sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief.'" (quoting Roseboro v. Billington, 606 F. Supp. 2d 104, 108 (D.D.C. 2009))); Roseboro, 606 F. Supp. 2d at 113 (suggesting that an employee may have been prejudiced when his employer wrongfully placed an AWOL charge in his personnel file, contributing to his termination); Jiggetts, 774 F. Supp. 3d at 210 ("A jury could also find that [the employee] was prejudiced by [the employer's] interference because she was required to spend unpaid leave hours working.").

Starting with the "interference" element, the record does not bear out Pruitt's contention that the District "regularly and repeatedly requested that [Pruitt] perform work while she was on FMLA leave." Pl.'s Opp'n at 6. She mentioned only one work request in her deposition, see MSJ, Ex. 2 at 169:1–171:1, and did not provide any additional information about these requests in her briefing.[4] The record indicates that shortly after sending this work request, Pruitt's supervisor confirmed her work status with HR and dropped the matter. See MSJ, Ex. 13 at 1 (documenting that Pruitt's supervisor reached out to HR, as she "wanted to make sure there has not been a status change"). And according to the District's statement of material facts, which the Court treats as undisputed, Pruitt was never told that she would be disciplined or terminated if she did not complete work while on leave. SOMF ¶ 89; see also MSJ, Ex. 2 at 165:19–22 (acknowledging, in her deposition testimony, that "no one verbally said" she would be disciplined if she did not complete the requested work).

[4] Pruitt's opposition brief gestures to a declaration by the D.C. Lottery's chief of marketing as evidence that she was "regularly and repeatedly" asked to work while on leave. See Pl.'s Opp'n at 6. But the declaration only states that the D.C. Lottery's director of marketing and communications "reached out" to Pruitt while she was on maternity leave. Id., Ex. 1 ¶ 3(f). The declaration offers no additional details about this contact.

Even if the D.C. Lottery interfered with Pruitt's FMLA leave, she has not established that she was "prejudiced" as a result. Pruitt has not pointed to any evidence connecting the purported interference to monetary losses or other harm to her job, benefits, or future career prospects. See Waggel, 957 F.3d at 1377 (citing Gordon, 778 F.3d at 166). For example, the work request that Pruitt described in her deposition did not lead to an "AWOL" charge, a suspension, or any other adverse action. It did not even lead to denial of her then-pending FMLA request, which was promptly granted later that day. See MSJ, Ex. 14 at 1; MSJ, Ex. 15 at 1–2. Instead, she was fired more than four months later for entirely separate reasons: She was absent without leave and could not perform the essential functions of her position. See MSJ, Ex. 21. And "in this Circuit, it is well established that '[r]ights to FMLA leave—whether in the application phase, medical certification phase, or off-work phase—do not protect an employee's job against a legitimate, unrelated, reason for separation from employment.'" Williams, 304 F. Supp. 3d at 194 (alteration in original) (quoting Hopkins v. Grant Thornton Int'l, 851 F. Supp. 2d 146, 155 (D.D.C. 2012)). There is, accordingly, no genuine dispute of material fact as to whether the District interfered with Pruitt's FMLA rights.

b. Retaliation

Pruitt next contends that the District "intentionally and willfully" retaliated against her for taking leave by terminating her employment. Am. Compl. ¶¶ 36–37, 65. To support this claim, she points to the "temporal proximity" between the "expiration of her leave" on March 31, 2023 and her termination on May 30, 2023 as "more than enough evidence" of retaliation to defeat summary judgment. Pl.'s Opp'n at 7.

A plaintiff may bring retaliation claims under the FMLA and DCFMLA "by alleging an employer discriminated against her for taking FMLA leave." Waggel, 957 F.3d at 1375 (citing

Gordon, 778 F.3d at 161); see also Thomas v. District of Columbia, 227 F. Supp. 3d 88, 98 (D.D.C. 2016) (acknowledging that "courts regularly analyze both the FMLA and the DCFMLA under the same legal framework"). Here too, an FMLA retaliation claim is assessed under the McDonnell Douglas framework. See McFadden, 611 F.3d 1 at 3, 6; Williams, 304 F. Supp. 3d at 190. The District has provided a non-retaliatory reason for Pruitt's termination, so the burden-shifting framework falls away and the "only question is the ultimate factual issue in the case—retaliation '*vel non*.'" George v. Molson Coors Beverage Co. USA, No. 22-7111, 2023 WL 2661588, at *3 (D.C. Cir. Mar. 28, 2023) (quoting Solomon v. Vilsack, 763 F.3d 1, 14 (D.C. Cir. 2014)). The Court may "resolve that question in favor of the employer based either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of her case." Taylor v. Solis, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009).

Pruitt's insistence that temporal proximity is "more than enough evidence" to survive summary judgment misses the mark. While temporal proximity between the exercise of protected FMLA activity and an adverse employment action can establish a *prima facie* case, see Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1368 (D.C. Cir. 2000), it is not sufficient to demonstrate that the employer's reason is pretextual, which "requires 'positive evidence beyond mere proximity,'" Waggel, 957 F.3d at 1376 (quoting Minter, 809 F.3d at 71–72); see also Miles v. Howard Univ., 653 F. App'x 3, 9 (D.C. Cir. 2016) (per curiam) ("Temporal proximity, standing alone, cannot rebut an employer's legitimate, non-discriminatory reason for an adverse employment action."). Instead, courts in this circuit "evaluate[] the specific facts of each case to determine whether inferring causation is appropriate." Hamilton, 666 F.3d at 1358. In this case, the District's reasons for terminating Pruitt were legitimate and non-retaliatory, as she failed to report for work after exhausting all available leave. Without any

additional evidence of pretext beyond generalized claims of suspect timing, the District is entitled to summary judgment on Pruitt's DCFMLA claim.

*3. Count IV: Violation of the FLSA*

Pruitt also claims that the District violated the FLSA by denying her "at least 400 overtime hours" of pay for working evening and weekend events. Pl.'s Opp'n at 11; see Am. Compl. ¶¶ 10–11. Pruitt's timesheets do not reflect these additional hours, but she contends that she was instructed not to document overtime. See Pl.'s Opp'n at 10 ("Plaintiff was instructed to simply enter hours reflecting 40 hours per week and 80 hours per pay period.").

At the outset, Pruitt has effectively conceded that she is not entitled to overtime pay. Under the FLSA, an employee who works "longer than forty hours" in a workweek is ordinarily entitled to overtime pay equal to "one and one-half times the regular rate at which [she] is employed." 29 U.S.C. § 207(a)(1); see Smith v. GEICO, 590 F.3d 886, 892 (D.C. Cir. 2010). However, an employee is exempt from this provision if she is "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). An employee is "employed in a bona fide administrative capacity" if (1) she is compensated "at a rate not less than $684 per week"; (2) her "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) her "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a) (2020);[5]

[5] As the District notes in its motion for summary judgment, the Department of Labor "update[d] this rule's salary thresholds" in 2024, but the update was vacated by the court in Texas v. United States Department of Labor, 756 F. Supp. 3d 361, 398 (E.D. Tex. 2024). MSJ P. & A. at 31 n.14. The Court therefore cites the threshold provided by the 2020 version of the Code of Federal Regulations, which was operative at the time of the events in this case.

see Long v. Endocrine Soc'y, 263 F. Supp. 3d 275, 289–90 (D.D.C. 2017) (describing the regulation as a "'standard duties test' to determine whether an employee is exempt").[6]

The District's motion for summary judgment explains in detail why Pruitt's role as a web communications specialist falls within this exemption. See MSJ P. & A. at 31–35. Pruitt's opposition only addresses the third prong. See Hopkins, 284 F. Supp. 2d at 25 ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). Specifically, she submits that her work assignments were "completed in accordance with basic standards and practices," and she "did not exercise discretion or independent judgment for the majority of job tasks." Pl.'s Opp'n at 9–10. But these conclusory statements—unsupported by any evidence—are belied by both the record and the District's undisputed statement of material facts. See, e.g., SOMF ¶¶ 10 ("Plaintiff described her work as developing and implementing social media strategy to advertise D.C. Lottery products[.]"), 22 ("The role required her to 'determine the approaches and methods necessary to independently carry out assignments to meet program goals and objective[,]' and 'independently determine[] the approach to be taken and methodology used' for tasks." (alterations in original) (quoting MSJ, Ex. 1 at 7)), 24 ("The position required her to 'see[] what need[ed] to be done and do[] it[,]' 'produce[] quality work products under minimal supervision[,]' and '[w]ork to remedy problems without being told by a peer or supervisor[.]'" (alterations in original) (quoting MSJ,

[6] This exemption should be "narrowly construed against the employer in order to further Congress's goal of affording broad federal government protection." Hunter v. Sprint Corp., 453 F. Supp. 2d 44, 50 (D.D.C. 2006) (quoting Danesh v. Rite Aid Corp., 39 F. Supp. 2d 7, 10 (D.D.C. 1999)) (noting that the employer "has the burden of proving that the exemption applies").

Ex. 4 at 8)).[7] In light of Pruitt's concessions and the unrefuted evidence that she exercised "discretion and independent judgment with respect to matters of significance," 29 C.F.R. § 541.200(a)(3) (2025), there is no genuine dispute that she is exempted from overtime pay, see Smith, 590 F.3d at 891 n.5, 897 (concluding that the employer satisfied its burden of showing that the exemption applied based "on the largely undisputed record").

Even if Pruitt was not an exempted employee, she has not provided sufficient information about the nature of her overtime work to defeat summary judgment. To establish an FLSA claim for overtime pay, the plaintiff "has the burden of proving that [she] performed work for which he was not properly compensated." Arias v. U.S. Serv. Indus., Inc., 80 F.3d 509, 511 (D.C. Cir. 1996) (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946)). An employee can meet this burden by "securing the production" of timekeeping records from the employer. Anderson, 328 U.S. at 687. If the employer has not kept accurate or adequate records, however, "an employee has carried out [her] burden if [she] proves that [she] has in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. Once the employee meets her burden, the employer must present "evidence of the precise amount of work performed" or evidence that negates "the reasonableness of the inference to be drawn from the employee's evidence." Id. at 687–88. If the employer cannot meet this bar, the Court may award "approximate" damages to the employee. Id. at 688.

When the employee does not provide sufficient evidence of uncompensated work and therefore has not met her burden, courts in this district have granted summary judgment for the

[7] Pruitt's onboarding paperwork also listed her position as "exempt" under the FLSA. See MSJ, Ex. 1 at 1.

employer. In Deloatch v. Harris Teeter, Inc., for example, the plaintiff's sole evidence of uncompensated work was his deposition testimony and his interrogatory answers. 797 F. Supp. 2d 48, 56 (D.D.C. 2011). The court found that his claims of overtime were "largely conclusory and unsubstantiated by factual detail" because there were no associated dates and the plaintiff could not provide details about the work performed. Id. at 57. Accordingly, the plaintiff did not provide "sufficient grounds upon which a reasonable juror could infer the amount and extent of uncompensated work allegedly performed." Id.

Pruitt is in a comparable position. In her deposition, she claimed that she frequently worked overtime. See MSJ, Ex. 2 at 177:3–6. But she could not identify specific dates or provide much detail. First, she testified that she worked overtime when the lottery machines or website experienced outages, but she could not describe when those outages occurred or how many hours she worked. Id. at 179:6–180:3 (noting only that she worked "several" hours and that this happened "often," but stating that she couldn't "recall what year that was"). Second, she claimed that she "stayed up all night doing the social media" when someone won a $1 million jackpot, but she could not recall the year and did not provide details about the nature or duration of her work. Id. at 180:17–181:2. Third, she alleged that she worked overtime when new games would launch, but she could not recall when that occurred. Id. at 181:3–8; see also MSJ, Ex. 33 at 1–2 (listing purported "incidents of overtime" without approximate dates or details about the work performed). Fourth, Pruitt asserted that she worked overtime "when the Mega Millions or the Powerball went above $300 million." MSJ, Ex. 2 at 181:9–16. She added that she worked "at minimum three hours" each time the jackpot increased, which could happen "three times in a day" and sometimes "over the weekend" or "over the holidays." Id. at 182:11–21. But again, she was thin on specifics. See id. at 182:14–15 (noting that the jackpot increased

"several times"), 182:19–21 (stating that she would work "at minimum three hours," but it "depend[ed]" on the "type of promotion"), 183:5–10 (declining to provide specifics).[8]

Pruitt's opposition brief similarly fails to provide evidence supporting her overtime claims. The only example of uncompensated overtime work that she cites is when the Mega Millions and Powerball jackpots rose above $300 million. Her brief contends that this occurred in "July and October, 2022 and January, April, August, October and December, 2023," which were are "all times during which [she] was employed." Pl.'s Opp'n at 11. Not so. According to the uncontroverted statement of material facts, Pruitt last worked on December 9, 2022, see SOMF ¶ 80, and she was terminated on May 30, 2023, id. ¶ 83. She could not have worked overtime after December 2022 because she was not working at all. To support her claims of overtime in July and October 2022, she attaches screenshots of the Mega Millions website. See Pl.'s Opp'n, Exs. 2–3. But these screenshots do not establish when the jackpots rose above $300 million, nor do they shed light on when Pruitt worked overtime.[9] Without more specific information about when Pruitt actually worked outside of her scheduled work hours, her FLSA claim cannot survive summary judgment. See Deloatch, 797 F. Supp. 2d at 58.[10]

---

[8] Pruitt's interrogatory responses shed no additional light on her overtime claims. The responses point to documents produced in discovery, see MSJ, Ex. 32 at 13, but her opposition brief did not cite to or attach these documents, see Twist, 854 F.2d at 1425 ("[A] district court may legitimately look to and rely upon counsel to identify the pertinent parts of the record, to isolate the facts that are deemed to be material, and to distinguish those facts which are disputed from those that are undisputed.").

[9] Indeed, Pruitt appeared to be on intermittent leave in July and October 2022. See MSJ, Ex. 26 at 1, 4; MSJ, Ex. 28 at 2.

[10] The Court need not analyze the second prong of the burden-shifting test established by Anderson, 328 U.S. at 687–88, to determine whether the District presented any evidence to negate "the reasonableness of the inference to be drawn" from Pruitt's evidence, id. at 688. While the court in Deloatch did turn to the second prong despite the plaintiff's failure to satisfy his burden, courts in sister circuits have granted summary judgment without doing so. See, e.g., Lee v. Vance Exec. Prot., Inc., 7 F. App'x 160, 166 (4th Cir. 2001) (affirming the district court's

*4. Count V: Retaliation in Violation of the DCHRA*

Finally, Pruitt alleges that the District violated the DCHRA by firing her in retaliation for (1) seeking leave and/or an accommodation in December 2022 and April 2023, and (2) filing a charge with the Equal Employment Opportunity Commission ("EEOC") in March 2023. Am. Compl. ¶¶ 40, 74–77. As with her claims of discrimination under the DCHRA and retaliation under the DCFMLA, the District has provided a non-retaliatory reason for her termination. And once again, Pruitt's only evidence of pretext is the temporal proximity between the denial of her leave request, the District's response to her EEOC charge, and her termination. Pl.'s Opp'n at 4.

Retaliation claims under the DCHRA are analyzed under the same "analytical framework" as those under the ADA and FMLA. McFadden, 611 F.3d at 6; see Ranowsky v.

---

grant of summary judgment when the plaintiff provided "insufficient evidence to estimate the amount and extent of hours worked in excess of forty per week" such that the court could not even "estimate the unrecorded hours," without looking to the sufficiency of the evidence proffered by the defendant); McLaughlin v. Murphy, 436 F. Supp. 2d 732, 738 (D. Md. 2005) (granting summary judgment for the defendant when the plaintiff could not meet his burden under the Anderson test, without shifting the burden to the defendant-employer). Accordingly, although courts in this district have recognized that "[a] defendant employer is not entitled to summary judgment on the issue of damages because they challenge the sufficiency or reasonableness of a plaintiff's evidence" given that "such situations present a dispute of material fact which require credibility determinations to resolve," Romero v. RBS Constr. Corp., No. 18-cv-179 (EGS), 2022 WL 522989, at *5 (D.D.C. Feb. 22, 2022) (collecting cases), no credibility determination is required when, as here, the plaintiff has not presented sufficient evidence to create a dispute of material fact as to the amount and extent of uncompensated work outside of scheduled working hours. In fact, in the cases where the court has denied summary judgment to avoid making an unwarranted credibility determination, the plaintiff supplied far more detailed evidence than Pruitt, allowing the court to at least approximate the amount of uncompensated work. See, e.g., Hunter, 453 F. Supp. 2d at 48–49, 53 (denying summary judgment when the plaintiff created an itemized spreadsheet to document his overtime based on his recollection and the defendant "focuse[d] on trying to negate 'the reasonableness of the inference to be drawn from the employee's evidence'" because resolving the issue would require a credibility determination); Escamilla v. Nuyen, 200 F. Supp. 3d 114, 119, 122–23 (D.D.C. 2016) (arriving at the same conclusion when the plaintiff "claim[ed] he worked approximately 66 hours per week" and supported that allegation with two affidavits but the defendant "proffered evidence that Plaintiff only worked approximately 35 hours per week," such that any conclusion "require[d] an assessment of the credibility" of the parties).

Nat'l R.R. Passenger Corp., 244 F. Supp. 3d 138, 143–44 (D.D.C. 2017), aff'd, 746 F. App'x 23 (D.C. Cir. 2018). Because the District has offered a non-retaliatory reason for Pruitt's termination, "the only relevant inquiry is whether the employee has put forth sufficient evidence for a reasonable jury to conclude that the employer's proffered explanation is a mere pretext and the employer . . . retaliated against the employee." Ranowsky, 244 F. Supp. 3d at 144 (citing Allen v. Johnson, 795 F.3d 34, 39 (D.C. Cir. 2015)). "Summary judgment must be granted for the defendant if the plaintiff fails to 'produce sufficient evidence that would discredit [the employer's proffered explanation] and show that the actions were retaliatory[.]'" Id. (first alteration in original) (quoting Baloch v. Kempthorne, 550 F.3d 1191, 1200 (D.C. Cir. 2008)). Critically, "the mere fact that an employer's adverse action follows closely after an employee's assertion of rights," including the filing of an EEOC charge, "will not overcome the presumption that the employer's asserted reasons are valid." Id. at 146–47 (citing Allen, 795 F.3d at 47). "[P]ositive evidence beyond mere proximity is required." Woodruff v. Peters, 482 F.3d 521, 530 (D.C. Cir. 2007).

Pruitt has not offered any evidence of a connection between her December 2022 and April 2023 leave requests and her termination, other than the fact that these events were a few months apart. As for the December 2022 request, Pruitt was ultimately *granted* the full sixteen weeks of leave to which she was entitled. MSJ, Ex. 15 at 1–2. As for the April 2023 request, she was informed that she had exhausted her FMLA and DCFMLA leave. MSJ, Ex. 17 at 1–2. The District offered to consider an alternative accommodation, MSJ, Ex. 18 at 3, but instead of engaging with HR, Pruitt continued to accrue unscheduled absences for multiple weeks before her termination, see MSJ, Ex. 20 at 8; MSJ, Ex. 21 at 1. And as for the March 2023 EEOC charge, the District fired her more than two months later, *after* she declined the District's offer

for an alternative accommodation and accrued multiple weeks of unscheduled absences. See MSJ, Ex. 21 at 1. Because no reasonable jury could conclude that the District's explanation for Pruitt's termination was pretextual, it is entitled to summary judgment. See Ranowsky, 244 F. Supp. 3d at 146–47.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's [24] Motion for Summary Judgment. A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 20, 2026